## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

**DANN SLAYDEN CROSS III, MBA, DR. SHARON HARVEY CROSS, PsyD., and their sons F.C., R.C., and D.C.,**

    Plaintiffs,

v.

**DOCTORS HOSPITAL OF AUGUSTA, LLC, et al.,**

    Defendants.

Civil Action No. 5:14-CV-6 (HL)

## ORDER

Before the Court are motions to dismiss the Complaint by each of the Defendants in this action,[1] as well as various motions to stay[2] and to strike.[3] The Court held a hearing on these motions on May 12, 2014. For the reasons stated below, the motions to dismiss are granted, thus rendering moot the motions to stay and the motions to strike.

---

[1] Defendants James Cole and his Spouse's Motion to Dismiss (Doc. 34); Richard Cartie, M.D.'s Motion to Dismiss (Doc. 39); Edna Messer's Motion to Dismiss (Doc. 43); Doctors Hospital of Augusta, LLC and Staff's Motion to Dismiss (Doc. 44); Judge Alicia Rambo's Motion to Dismiss (Doc. 46); Jimmy Wren and his Spouse's Motion to Dismiss (Doc. 50); Karan Albritton and Susan Barr's Motion to Dismiss (Doc. 53); Stacee Fussell and Estella Lusane's Motion to Dismiss (Docs. 55, 57 and 60); James Hurt's Motion to Dismiss (Doc. 93); and Patrick Eidson's Motion to Dismiss (Doc. 99).

[2] Defendant Patrick Eidson's Motion to Stay (Doc. 101).

[3] Defendants Richard Cartie, M.D.'s Motion to Strike (Doc. 86) and Jimmy Wren and his Spouse's Motion to Strike (Doc. 96).

## I.     Motion to Dismiss Standard

To avoid dismissal under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible if its factual allegations allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability. Twombly, 550 U.S. at 556.

In ruling on a motion to dismiss, the court must accept "all well-pleaded facts … as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n. 1 (11th Cir. 1999). However, this tenet does not apply to legal conclusions in the complaint. Iqbal, 556 U.S. at 679. "[C]onclusory allegations, unwarranted deductions of fact, or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002). A court must dismiss the complaint if, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992

2

F.2d 1171, 1174 (11th Cir. 1993) (citing Executive 100, Inc. v. Martin County, 992 F.2d 1536, 1539 (11th Cir. 1991) and Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed.2d 939 (1946)).

If a motion to dismiss asserts under Rule 12(b)(1) that the federal district court lacks subject matter jurisdiction over a claim, then the court is free to consider matters beyond the pleadings. Goodman ex rel. Goodman v. Sipos, 259 F.3d 1327, 1331 n. 6 (11th Cir. 2001) (citing various cases). In contrast, if a motion to dismiss a complaint for failure to state a claim under Rule 12(b)(6) relies on evidence outside the pleadings, the court must convert the motion into a motion for summary judgment and allow the parties to present relevant evidence. Id.; Rule 12(d).

## II.   Factual Background

Construing the factual allegations in the Complaint in favor of Plaintiffs, Plaintiffs Dann and Sharon Cross ("the Crosses" jointly and "Mr. Cross" and "Mrs. Cross" individually) have three sons, F.C., R.C., and D.C. (collectively "Plaintiffs"), and reside in Macon County, Georgia. (Complaint, Doc. 1, ¶1). On December 4, 2012, F.C. burned his toes and feet in a fire pit in the Plaintiffs' yard.[4] His parents cleaned the burn wounds, applied honey, and loosely wrapped

---

[4] The fact that the burn injury occurred in an outdoor fire pit is gleaned from the court order Plaintiffs attached as an exhibit to their Complaint, Mr. Cross's statements at the motions hearing on May 12, 2014, and medical records from the Hospital filed by Plaintiffs. (See Judge Alicia Rambo's Order for Shelter Care, Ex. A to the Complaint;

his feet. They then took him to the Coliseum Hospital in Macon, Georgia, but at the recommendation of the Coliseum staff, the Crosses proceeded to the Doctors Hospital ("the Hospital") in Augusta, Georgia, where they arrived late at night on December 4. The Hospital scheduled F.C. to undergo surgery to clean his burn wounds and to perform skin grafts the following morning. (Id. at ¶¶29-34).

The next morning, Hospital staff inspected F.C.'s wounds and obtained the Crosses' informed consent for the surgery. However, after learning that F.C. had never received a tetanus vaccine, Dr. Richard Cartie ("Dr. Cartie") told the Crosses that the surgery could not be done until F.C. was vaccinated. The parents refused consent for the vaccination and, after a heated discussion with Dr. Cartie, fired him. (Id. at ¶¶35-37, 43). Plaintiffs were never provided any information about the tetanus vaccine.[5] (Id. at ¶¶79-80). Assisted by Nurse Donna Masters ("Masters"), Dr. Cartie then ordered that F.C.'s surgery be delayed until the vaccine could be administered. Masters later informed the Crosses that the delay resulted from another surgery becoming more exigent. At some point, the parents asked Masters to contact the Hospital's CEO. Masters said the CEO would contact them "today or tomorrow," but they never heard from him. (Id. at ¶¶46, 53, 65-66).

---

Transcript of Motions Hearing, Doc. 107, pp. 15-16; medical records, Ex. C to Plaintiffs' Response to the Hospital and Staff's Motion to Dismiss, Doc. 71-1, p. 3).

[5] More specifically, Plaintiffs evidently never learned what might have been in the vaccine.

Mr. Cross also fell into disagreement with the Hospital's admissions office. He refused to sign the admissions form as it was presented to him and insisted on striking out provisions he found objectionable. After the Crosses stated that they were "self-pay," the Hospital's admission director Chris Haga ("Haga") told them they would have to apply for Medicaid and provided them with another form. Mr. Cross refused to apply for Medicaid or to sign the form because he disliked its terms. He also declined permission for the Hospital to copy his identification card, although he did allow Haga to inspect it. (Id. at ¶¶55-61). Working together Haga, Masters, Dr. Cartie, the Hospital's chief of security James Cole ("Cole"), and its administrator Heyward Wells ("Wells") reported to the Richmond County Sheriff's Department their concerns that Mr. Cross's identification card had been tampered with or altered. Jimmy Wren ("Wren"), a Richmond County deputy sheriff, investigated the report, questioned Plaintiffs, and did not pursue the matter further.[6] (Id. at ¶¶67-68).

Around noon on December 5, Dr. Cartie contacted the Richmond County office of the Department of Family and Children Services ("DFCS"), regarding F.C.'s medical situation. Dr. Cartie also spoke with Karan Albritton, the Macon County DFCS supervisor, about the possibility of DFCS's taking custody of all of the Crosses' sons. (Id. at ¶¶62, 71). Macon County DFCS discussed F.C.'s

---

[6] The Complaint alleges that these individuals "employed" Wren, but deputy sheriffs are employees of the county sheriff. Grech v. Clayton County, Ga., 335 F.3d 1326, 1330 (11th Cir. 2003).

circumstances with Patrick Eidson ("Eidson"), a Special Assistant Attorney General ("SAAG") to the Georgia Attorney General's office, who then told Alicia Rambo ("Judge Rambo"), a state juvenile court judge in Macon County, about the situation. Judge Rambo instructed Eidson to prepare an order, which she subsequently signed, transferring F.C.'s custody to Macon County DFCS until a hearing she set for December 10. (Transcript of Motions Hearing, Doc. 107, pp. 83-87; Judge Rambo Affidavit, Ex. A to Judge Rambo's Motion to Dismiss, Doc. 46, ¶¶4-8). Judge Rambo's order specifically cited information provided to her concerning how F.C. burned his feet, that he had not received any vaccinations during his lifetime, that his parents refused permission to allow the Hospital to provide the tetanus vaccination, and that his life was thus reportedly in danger. (Judge Rambo's Shelter Care Order, Ex. A to the Complaint, Doc. 1-1).

Judge Rambo's order enabled the Hospital to vaccinate F.C. Accompanied by armed guards and Deputy Wren, Nurse Julie Lewis ("Lewis") entered Plaintiffs' room around 8 p.m. on December 5, handed them a copy of Judge Rambo's order, and announced the tetanus vaccine would then be administered. Lewis told Plaintiffs they could leave the hospital or stay with F.C. so long as they did not try to interfere with the vaccination. The parents chose to remain with their son. They accompanied F.C. to a different room where Nurse Terrell Yelverton, after a twenty-five minute delay, vaccinated the child. (Complaint,

¶¶72-73, 84-86, 90-92). At some point, the surgery on F.C.'s burn wounds was also performed. (Id. at ¶50).

Around 1 p.m. on December 6, Albritton and Susan Barr ("Barr"), who also worked for Macon County DFCS, took F.C. and transported him to an unknown location. Armed guards, who had remained posted outside of Plaintiffs' hospital room and at the hospital exits following the vaccination, watched F.C. being taken from the Crosses. Cole escorted the parents out of the hospital. He expressed regret for what had happened to the Plaintiffs and said it was "wrong." As Mrs. Cross was leaving the hospital room, she asked Masters whether the nurse was happy, and the nurse said, "No." (Id. at ¶¶97-100).

On December 7, the Crosses were able to visit F.C. at the Macon County DFCS office. Barr informed the parents of the conditions they would have to meet before F.C. would be returned to them. After receiving the Crosses' permission, Barr entered and walked through their home, and she also spoke with their sons R.C. and D.C. outside of their presence.[7] At some point on December 7, Macon County DFCS placed F.C. in the care of his grandparents. (Id. at ¶¶102-06, 109).

Eager to regain custody of F.C., the Crosses attended the hearing on December 10 set by Judge Rambo. As a precondition to returning custody of

---

[7] The Crosses insist that their permission was given "under duress." (Complaint, ¶¶104-08). Even if the parents only agreed to Barr's entry and questioning of their sons from a fear of how their refusal might affect the custody proceedings, this fact would not vitiate the reality that their permission was granted.

F.C., Judge Rambo required the Crosses to agree to work with Macon County DFCS for twelve months and to comply with certain provisions, which were set out in an order prepared by SAAG James Hurt. (Id. at ¶¶112-14; Transcript of Motions Hearing, p. 90). Plaintiffs agreed to Judge Rambo's conditions and signed a document to that effect. Judge Rambo also ordered that Estella Lusane and her staff, which included Stacee Fussell, serve as the Court Appointed Special Advocate ("CASA") for F.C. (Complaint, ¶¶116, 118, 122; Appointment of Court Appointed Special Advocate, Ex. D to the Complaint, Doc. 1-4). The order appointing a CASA expressly directed third parties to permit the CASA to inspect and copy F.C.'s medical records even without his parents' consent. (Id.) Edna Messer, the officer manager for Pediatric Associates, subsequently allowed F.C.'s medical records to be released to Judge Rambo, Lusane, and Fussell, and she refused to tell Plaintiffs why she did so. (Complaint, ¶¶122, 124).

The Crosses' frustrations did not end after they regained custody of F.C. They discovered that, while their son had been in DFCS's care, a bracelet had been tied too tightly onto his wrist and injured it.  F.C. was later diagnosed with hearing loss and suffered a delayed ability to speak. Hoping to learn the procedure for filing a complaint with the Hospital, Plaintiffs contacted Masters, Cole, and Trisha Foster, who is the Hospital's patient advocate, but no one responded. Plaintiffs also informed the Hospital's staff that they did not want their

8

medical information to be shared with third parties, but Dr. Cartie disclosed their information to Medicaid for billing purposes. (Id. at ¶¶96, 110, 129, 135-40).

The Crosses filed a *pro se* suit in this Court on January 7, 2014, bringing claims in their own names as well as the names of their sons. The Plaintiffs have sued not only the named Defendants in their individual capacities but also their spouses who are not named or otherwise identified. The Plaintiffs seek redress pursuant to 42 U.S.C. § 1983 for the alleged violation of their rights under the Fourth and Fifth Amendments to the United States Constitution. The Complaint's first cause of action is a general allegation of unreasonable seizure and false imprisonment in violation of the Fourth Amendment. The second cause of action is for the unreasonable search and seizure of Plaintiffs' medical records under the Fourth and Fifth Amendments. The third cause of action is a general claim for the deprivation of Plaintiffs' due process rights under the Fifth Amendment. The fourth cause of action is a Fifth Amendment claim relating to F.C.'s wrist injury from the arm bracelet. The fifth cause of action alleges the unreasonable search of Plaintiffs' home and the seizure of R.C. and D.C. in violation of the Fourth Amendment. The sixth cause of action alleges that the Hospital had an informal custom of working with state actors that caused the unreasonable seizure of F.C. in contravention of the Fourth and Fifth Amendments. (*See* id. at ¶¶142-61).

### III.    Discussion

Because this Court lacks subject matter jurisdiction over most of Plaintiffs' claims, it declines to address the merits of those claims. *See* Sipos, 259 F.3d at 1331 n. 6. For the reasons stated below, the remaining claims must also be dismissed.

### A.    Application of the Rooker—Feldman Doctrine

A number of Plaintiffs' claims must be dismissed as a matter of law because this Court lacks jurisdiction to hear them in light of the principles articulated by the Supreme Court in Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 476-82, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), commonly known as the "Rooker—Feldman doctrine." The "doctrine provides that federal courts, other than the United States Supreme Court, have no authority to review the final judgments of state courts." Sipos, 259 F.3d at 1332 (quoting Siegel v. LePore, 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc)). A federal district court has no jurisdiction to hear a claim if the issue before it is "inextricably intertwined" with a state court judgment "so that (1) the success of the federal claim would effectively nullify the state court judgment, or that (2) the federal claim would only succeed to the extent that the state court wrongly decided the issues." Alvarez v. Attorney General for Fla., 679 F.3d 1257, 1262-

63 (11th Cir. 2012) (internal citation and quotation omitted). The doctrine prevents state court losers "from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." Johnson v. De Grandy, 512 U.S. 997, 1005-06, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). However, Rooker—Feldman does not apply if a plaintiff lacked a reasonable opportunity to present her federal claims in the state court proceeding. Sipos, 259 F.3d at 1332.

The facts and holding in Sipos are on point here. Summarizing the facts in Sipos shows that a supervisor for Georgia DFCS received reports that the plaintiff's son was suffering from neglect. The caseworker assigned to the case investigated the reports and became concerned enough to seek the assistance of the county police department. The caseworker and the police proceeded to conduct a quick search of the home in the plaintiff's absence and without obtaining her consent or a search warrant, although the search revealed no evidence of an immediate risk to the son. After a confidential source subsequently claimed that the mother had threatened to kill herself and her son, DFCS filed a custody petition in juvenile court and supplied an affidavit from the caseworker. The juvenile court judge granted custody of the son to DFCS, which placed him in the care of a family friend. However, after the family friend denied

DFCS access to the son, the caseworker threatened to call the police if the child was not returned to DFCS. The juvenile court eventually awarded custody of the child to his father. Id. at 1328-30. The mother sued the DFCS supervisor and caseworker in federal court under § 1983 claiming that her and her son's constitutional rights had been violated by 1) the search of the home, 2) the alleged falsity of the caseworker's affidavit, and 3) the threat to call the police if the family friend did not surrender the son. Id. at 1330. The district court dismissed all three claims, citing the Rooker—Feldman doctrine. Id. at 1331.

On appeal, the Eleventh Circuit agreed that Rooker—Feldman applied to the case but held that it only barred the last two claims. Id. at 1333-34. The previous occasions the Eleventh Circuit had applied Rooker—Feldman to child custody cases had involved ongoing state court proceedings into which the federal district court had been asked to intervene. Id. at 1332-33. Even though the Sipos lawsuit sought redress for alleged constitutional violations in a completed custody dispute, the appellate court determined that the doctrine was still applicable. Id. at 1333. The caseworker's affidavit was inextricably intertwined with the state judgment because the juvenile court had entered its order based on the affidavit and only after determining it was credible. Id. at 1334. Thus, the claim in federal district court could succeed "only to the extent that the state court wrongly decided" the affidavit's credibility and the custody

dispute. Id. (quoting Siegel, 234 F.3d at 1172). The caseworker's threat to the family friend concerning access to the child was similarly tied to the state court proceedings given that "the factual and legal predicate for it" was the court order denying custody to the plaintiff mother. Id. Only the mother's first claim, regarding the search of her home, could be heard by a federal district court because "no evidence or other information derived from the search was introduced in the state court proceedings or was relied upon by the court when it decided to take away [the mother]'s custody…." Id. The constitutionality of the search was not, nor could it have been, raised in the juvenile court proceedings. Id.

The Eleventh Circuit also asked whether the Sipos plaintiffs had had an opportunity to pursue their constitutional claims in state court, and determined they had. Id. "Georgia law permits constitutional challenges to a juvenile court's orders to be brought in the juvenile court, and those challenges are subject to review by the Georgia Supreme Court, and ultimately by the United States Supreme Court." Id. (citing In re Suggs, 249 Ga. 365, 291 S.E.2d 233 (1982)). Therefore, the Eleventh Circuit affirmed the dismissal of two of the claims and remanded the case back to the district court to address the merits of the remaining claim. Id. at 1335.

Applying these precedents here requires the dismissal of many of Plaintiffs' claims because this Court has no subject matter jurisdiction over them.

The Rooker—Feldman doctrine bars Plaintiffs' claims for any constitutional violations that may have occurred beginning with Dr. Cartie's report to DFCS concerning F.C.'s medical condition.[8] The events that occurred from that point forward were inextricably intertwined with the state court judgment. Judge Rambo reviewed the information relayed to her, determined its credibility, and then entered orders concerning F.C.'s custody that were implemented by the other Defendants in this case. Plaintiffs' current lawsuit seeks, among other things, a determination that Judge Rambo's orders were inconsistent with the law. However, if Plaintiffs believed Judge Rambo's orders were unconstitutional or otherwise contrary to the law, they had an opportunity to appeal to the Supreme Court of Georgia and ultimately the United States Supreme Court. Had Plaintiffs appealed, then the subsequent constitutional violations that allegedly occurred would have been averted. Why Plaintiffs did not raise their constitutional claims in state court is a decision best known to themselves, but this Court has no jurisdiction to review Judge Rambo's orders.

Rooker—Feldman bars Plaintiffs' claims related to Dr. Cartie's initial report to DFCS and the subsequent events. Thus, the second, fourth, fifth, and sixth causes of action in the Complaint are dismissed as a matter of law, as are any claims alleged against Defendants Terrell Yelverton, Julie Lewis, Judge Alicia

---

[8] The allegation that certain Defendants refused to inform Plaintiffs how to file a complaint with the Hospital is not barred by Rooker—Feldman, but, as addressed below, any claim based on this allegation is subject to dismissal on other grounds.

Rambo, Patrick Eidson, James Hurt, Karan Albritton, Susan Barr, Edna Messer, Stacee Fussell, and Estella Lusane. The factual and legal predicate of the allegations supporting these claims was Judge Rambo's decisions to award DFCS custody of F.C. after reviewing the information provided to her, to empower DFCS to ensure the Crosses complied with certain conditions, and to instruct third parties to provide CASA with F.C.'s medical records. The doctrine does not apply to any Defendant's action that was not inextricably intertwined with Judge Rambo's orders. Claims arising from questioning Mr. Cross about his identification card, requiring him to sign certain admission forms, delaying F.C.'s surgery because the Crosses refused permission for the tetanus vaccination, and refusing to tell Plaintiffs how to file a complaint are not barred by Rooker—Feldman, and the merits of these claims must be addressed.

### B.    Claims of F.C., R.C., and D.C.

The claims of F.C., R.C., and D.C. are dismissed without prejudice. Although the Crosses are allowed to bring a suit on behalf of their sons, the law does not allow a non-attorney parent to serve as legal counsel for a child. Whitehurst v. Wal-Mart, 306 F. App'x 446, 449 (11th Cir. 2008); Devine v. Indian River Cnty. Sch. Bd., 121 F.3d 576, 581 (11th Cir. 1997) (overruled on other grounds by Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007)). The sons' claims may only be heard if the children

have an attorney to represent them. At the motions hearing on May 12, 2014, the Court repeatedly urged the Crosses to consider retaining legal counsel, but they adamantly refused. The sons' claims must, therefore, be dismissed.

### C.    Plaintiffs' Remaining Claims

Plaintiffs' remaining claims are subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), for they fail to state a claim upon which relief may be granted. Plaintiffs seek redress under § 1983 for the violation of their rights under the Fourth and Fifth Amendments. The Fourth Amendment protects the right to be secure "against unreasonable searches and seizures." U.S. CONST. amend. IV. Although the Complaint refers to the due process guarantees of the Fifth Amendment, it is actually the Fourteenth Amendment that provides due process rights against actions by state officials. *See* Dusenbery v. United States, 534 U.S. 161, 167, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002). There is a substantive and a procedural component to the Due Process Clause of the Fourteenth Amendment, both of which are relevant to this case. *See* McKinney v. Pate, 20 F.3d 1550, 1555 (11th Cir. 1994). So far as this Court can decipher from the Complaint, Plaintiffs' only allegations of due process violations concern claims over which this Court has no subject matter jurisdiction in light of the foregoing analysis of the Rooker—Feldman doctrine.

Section 1983 only provides a cause of action against those who have committed constitutional violations while "acting under color of state law." <u>Patrick v. Floyd Med. Ctr.</u>, 201 F.3d 1313, 1315 (11th Cir. 2000). "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." <u>Harvey v. Harvey</u>, 940 F.2d 1127, 1130 (11th Cir. 1992). Someone who is not a government official qualifies as a "state actor" if 1) his action occurred as a result of the coercion or at least encouragement of a government entity ("State compulsion test"); 2) he performed a public function that is traditionally the state's exclusive prerogative ("public function test"); and 3) there is such a high degree of interdependence between the state and the private person that the latter "was a joint participant in the enterprise ('nexus/joint action test')." <u>Rayburn ex rel. Rayburn v. Hogue</u>, 241 F.3d 1341, 1347 (11th Cir. 2001) (quoting <u>NBC, Inc. v. Communications Workers of America</u>, 860 F.2d 1022, 1026-27 (11th Cir. 1988)). Thus, a conspiracy between private and state actors to commit a constitutional violation comes within § 1983's ambit. *See* <u>Harvey</u>, 949 F.2d at 1133. Furthermore, an employer cannot be held liable under § 1983 for the actions of its employees unless the employer's "custom" or "policy" was "the 'moving force' behind the constitutional deprivation." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997) (quoting <u>Monell v. Dep't of Social Servs. of N.Y.</u>, 436 U.S. 658, 690-94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see*

also Harvey, 949 F.2d at 1129-30 (applying the Monell holding to private parties as well).

### 1.    Deputy Sheriff Jimmy Wren

The claims against Deputy Wren are dismissed because they do not meet the standard set by Rule 12(b)(6). Plaintiffs allege Defendants Haga, Cole, Masters, Wells, and Dr. Cartie "employed Richmond County Sheriff Deputy Wren to intimidate and interrogate Plaintiffs under the pretext that an ID card had been 'reported' as appearing to have been tampered with or altered." (Complaint, ¶67). The Court takes this colorful language to mean Deputy Wren questioned Mr. Cross at the request of these Defendants in order to verify the man's identity. (See id. at ¶68). Deputy Wren also stood in the room while F.C. was vaccinated after Judge Rambo gave DFCS temporary custody of the child.[9] (Id. at ¶72). According to Plaintiffs, Deputy Wren is, therefore, guilty of unreasonable seizure and false imprisonment in violation of the Fourth Amendment as well as violating their due process rights.

Deputy Wren did not violate the Fourth Amendment. The Complaint does not allege that he seized anything or imprisoned the Plaintiffs. The Court declines to interpret the Complaint's vague reference to the presence of armed guards in the hallways so as to include Deputy Wren. Even if the allegation did include

---

[9] Deputy Wren has not raised a qualified immunity defense.

Deputy Wren, this scenario was hardly a detention because the Crosses were given the choice of leaving the hospital but chose to stay with F.C. until he left in DFCS's custody. Defendants wanted to prevent the Crosses from running off with F.C., not imprison them in the hospital. (Id. at ¶¶84-86, 97-98).

The verification of Mr. Cross's identity was also lawful. "[I]nterrogation relating to one's identify or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." I.N.S. v. Delgado, 466 U.S. 210, 216, 105 S.Ct. 1758, 80 L.Ed.2d 247 (1984). Whether an incident qualifies as a seizure depends on if force or a show of authority was involved so that "a reasonable person would have believed he was not free to leave." Id. at 215-16 (internal citation and quotation omitted) (noting that failing to inform someone he is free to leave does not vitiate the consensual nature of the interaction). The Court cannot conclude from the Complaint's general allegation concerning the questioning of Mr. Cross that a reasonable person in his position would have believed he could not leave.

Furthermore, Plaintiffs' claim that Deputy Wren violated their due process rights appears to be based on his standing in the room while F.C. was vaccinated. Plaintiffs may not pursue this particular claim in federal district court in light of the Rooker—Feldman doctrine. Plaintiffs have not alleged any other due process violation by Deputy Wren that meets federal pleading standards.

### 2.    The Hospital

Plaintiffs have failed to state a claim against the Hospital for two alternative reasons. First, the Hospital was not a state actor during the events in question, and, second, it did not have a custom or policy that caused violations of Plaintiffs' rights. Plaintiffs do not specifically allege that a government entity coerced or encouraged the Hospital to violate Plaintiffs' rights, and certainly a hospital is not performing a function that traditionally is the exclusive prerogative of the government. While the Hospital would be liable under § 1983 if it engaged in a conspiracy or joint nexus with government officials to violate Plaintiffs' constitutional interests, the Complaint does not adequately make such factual allegations. There is no allegation the Hospital entered a "symbiotic relationship" with state actors to engage in the "specific conduct of which the plaintiff[s] complain[]." Hogue, 241 F.3d at 1348 (internal citation and quotation omitted). Furthermore, an allegation of a conspiracy to violate the Constitution must be pled with specificity, provide the nature of the conspiracy, and state that the actors reached an understanding. Harvey, 949 F.2d at 1133. This level of detail is not to be found in the vague, conclusory allegation that the Hospital "has in place a formal or informal policy or custom of working with state actors resulting in the deprivation of Plaintiffs' rights." (Complaint, ¶134).

This general allegation of a policy or custom without reference to a specific policy is too vague to make the Hospital liable for any constitutional violations by its employees. For § 1983 purposes, "[a] policy is a decision that is officially adopted by the [employer], or created by an official of such rank that he or she could be said to be acting on behalf of the [employer]." Sewell, 117 F.3d at 489. Similarly, a "custom is a practice that is so settled and permanent that it takes on the force of law." Id. It is unclear what policy or custom Plaintiffs allege was at issue in this case. However, even assuming *ad arguendo* the Complaint alleges the Hospital had a policy of working with government officials to maintain security in its facility or a policy of disclosing patients' information to Medicaid for billing purposes, neither such policy can be said to have been the moving force behind a violation of Plaintiffs' rights. The claims against the Hospital are dismissed.

### 3.    Heyward Wells

Plaintiffs have also failed to state a claim against Heyward Wells, so their claims against him are dismissed. The Complaint's sole allegation concerning Wells is that he worked with other Defendants to have Deputy Wren question "Plaintiffs under the pretext that an ID card had been 'reported' as appearing to have been tampered with or altered." (Complaint, ¶¶67-68). As stated above, the deputy sheriff's interaction with Plaintiffs did not violate the Constitution.

### 4.   James Cole

The claims against James Cole also fail to meet the standard set by Rule 12(b)(6) and are dismissed. In addition to requesting Deputy Wren to verify Mr. Cross's identification, Cole escorted the Crosses and F.C.'s grandfather out of the hospital and told them what they had experienced was "wrong." (Complaint, ¶100). Cole's only other interaction involving the Plaintiffs[10] was his refusal to provide them with information for how to make a complaint with the Hospital. (Id. at ¶129). None of Cole's actions violated the law. Even if they did, Cole is not subject to § 1983 liability because he was not a state actor except arguably as relates to Deputy Wren's conversation with Plaintiffs.

### 5.   Thomas Dorn

Because the Complaint does not make any specific factual allegation against Thomas Dorn,[11] the claims against him are dismissed. See Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 570.

---

[10]  The Complaint also refers to a newspaper article quoting Cole concerning the Hospital's security policy and collaboration with the Richmond County Sheriff's Office for security purposes. (¶¶131-34).The Court fails to see the relevance of such general statements for the issues here. In any case, they certainly do not furnish adequately pled allegations that Cole violated Plaintiffs' rights.

[11]  During the motions hearing, Plaintiffs and Dorn's attorney referred to actions Dorn may have taken. However, because the Complaint does not allege this behavior, the Court must disregard them. See St. George v. Pinellas County, 285 F.3d 1334, 1337 (11th Cir. 2002); Fed. R. Civ. Pro. 8(a)(2). Even had the Complaint alleged Dorn took these actions, under Rooker—Feldman the Court would have no subject matter jurisdiction over such claims.

### 6.   Trisha Foster

The Complaint also fails to state a claim against Trisha Foster. Having done nothing more than refuse to tell Plaintiffs how to register a complaint with the Hospital, (Complaint, ¶129), Foster is not guilty of violating the Constitution.

### 7.   Dr. Richard Cartie

Because Plaintiffs have also failed to state a claim against Dr. Cartie, the claims against him must be dismissed. The Court must stress that Plaintiffs have only sued Dr. Cartie for constitutional violations, not medical negligence, which they expressly reaffirmed at the motions hearing on May 12. (Transcript of Motions Hearing, p. 53). However, in no sense could Dr. Cartie be said to have been a "state actor" under § 1983. The Complaint does not plausibly allege that Dr. Cartie ever served a function that traditionally is done by government entities or that a government actor ever coerced or encouraged him to violate Plaintiffs' rights. Three allegations superficially suggest Dr. Cartie conspired with state actors as part of a joint enterprise. As previously noted, the alleged conspiracy to have Deputy Wren question Mr. Cross about his identification card was not unlawful. The Complaint also alleges that Dr. Cartie communicated with DFCS on two occasions about F.C., but, as analyzed above, any claim based on these allegations is barred by Rooker—Feldman.

Anything else that Dr. Cartie did, such as delaying F.C.'s surgery until he could be vaccinated, did not violate the Constitution. The claims against him are dismissed.

### 8.    Chris Haga

The claims against Haga likewise fail to meet the Rule 12(b)(6) standard and must be dismissed. Haga, who is the admissions director for the Hospital, interacted with Mr. Cross concerning hospital admission documents, a Medicaid application, and an identification card, and he also requested Deputy Wren to question Mr. Cross about the card. (Complaint, ¶¶55-61, 67-68). As addressed above, Deputy Wren's verification of Mr. Cross's identity did not violate the Constitution. Haga is not subject to § 1983 liability for any of his other actions because they were not unlawful and because he was not a state actor while he did them.

### 9.    Donna Masters

The Complaint also fails to state a claim against Masters, who is the Hospital's nurse manager. Masters assisted Dr. Cartie in delaying F.C.'s surgery, told the Crosses the delay was due to a more pressing surgery, reassured them the Hospital's CEO would contact them "today or tomorrow," asked Deputy Wren to verify Mr. Cross's identity, tearfully denied being pleased when DFCS took custody of F.C., and refused to provide Plaintiffs with information concerning the

Hospital's complaint process. (Complaint, ¶¶46, 53, 65-67, 98-99, 129). Both Deputy Wren's interaction with Mr. Cross and the delay of F.C.'s surgery have already been addressed. None of the other actions violates the Constitution even if the Court were to assume Masters acted mendaciously, maliciously, or malevolently, nor was she a state actor when she performed them. The claims against her are dismissed.

### 10.   Spouses of the Named Defendants

Plaintiffs' claims against the spouses of the named Defendants are also dismissed. The Complaint fails to state a claim against the spouses upon which relief could be granted. Far from making allegations that would allow the Court to reasonably infer the spouses are liable to Plaintiffs for a deprivation of their rights, the Complaint does not state any factual allegations concerning the spouses at all. *See* Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 570.

### IV.   Conclusion

For the reasons stated above, the motions to dismiss are granted, the motions to stay along with the motions to strike are moot, and this case is dismissed.

**SO ORDERED**, this the 30th day of May, 2014.


*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**

scr